Filed 4/26/23 (unmodified opn. attached)

**CERTIFIED FOR PARTIAL PUBLICATION***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| K.R., | B321655 |
| Petitioner, | (Los Angeles County Super. Ct. No. FJ57352) |
| v. | |
| THE SUPERIOR COURT OF LOS ANGELES COUNTY, | ORDER MODIFYING OPINION; NO CHANGE IN JUDGMENT |
| Respondent; | |
| THE PEOPLE, | |
| Real Party in Interest. | |

THE COURT:

It is ordered that the opinion filed on March 30, 2023, be modified as follows:

---

\* Pursuant to California Rules of Court, rule 8.1100, the opinion is certified for publication with the exception of parts II.C.3 and II.C.4.

On page 20, line 6 under subheading 1. *Relevant Proceedings*, change Dr. Ward's first name from "Kelli" to "Jody" so the sentence reads:

> The court granted the motion, and on April 20 signed an order to allow the expert, Dr. Jody Ward, to examine K.R.

There is no change in the judgment.

_____

WEINGART, J.          CHANEY, J.          BENDIX, Acting P. J.

Filed 3/30/23 (unmodified opinion)

**CERTIFIED FOR PARTIAL PUBLICATION***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| K.R., | B321655 |
| Petitioner, | (Los Angeles County Super. Ct. No. FJ57352) |
| v. | |
| THE SUPERIOR COURT OF LOS ANGELES COUNTY, | |
| Respondent; | |
| THE PEOPLE, | |
| Real Party in Interest. | |

ORIGINAL PROCEEDINGS; petition for writ of mandate. Christopher Smith, Judge. Petition denied.

Cyn Yamasiro, Markéta Sims, and Martin Lijtmaer for Petitioner.

---

* Pursuant to California Rules of Court, rule 8.1100, this opinion is certified for publication with the exception of parts II.C.3 and II.C.4.

No appearance for Respondent.

George Gascón, District Attorney, Tracey Whitney and Felicia Shu, Deputy District Attorneys, for Real Party in Interest.

_____

In 2018, the Legislature enacted Assembly Bill No. 1214 (2017-2018 Reg. Sess.) (Stats. 2018, ch. 991), which repealed the then existing statute governing competency proceedings in juvenile delinquency cases and replaced it with a new version, Welfare and Institutions Code section 709.[1]  According to the bill's author, the purpose of the bill was to eliminate situations in which juveniles found not competent to stand trial "remain[ed] in [juvenile] hall without clear timelines governing the length of remediation services."  (Sen. Com. on Pub. Saf., Analysis of Assem. Bill No. 1214 (2017-2018 Reg. Sess.) June 26, 2018, p. 7.)  To that end, the new version of the statute provides that for juveniles, "the total remediation period shall not exceed one year from the finding of incompetency."  (§ 709, subd. (h)(3).)

In this case, almost 15 months elapsed from the time the juvenile court found petitioner K.R. incompetent to stand trial and referred him for remediation, until the court determined that he had been restored to competency and reinstated the proceedings.  K.R remained in juvenile hall for that entire period.  He filed a writ petition arguing that the court lost jurisdiction when it failed to make a final ruling on his competency by the one-year deadline for remediation services, and was required to dismiss the case at that point.  In the alternative, he argues the

_____

[1] Unless otherwise specified, subsequent statutory references are to the Welfare and Institutions Code.

court erred by allowing the prosecution to employ its own expert to examine him, and asks us to order the juvenile court to strike the expert's testimony.

We disagree with both arguments. In the published portion of our opinion, we hold that although section 709 establishes a maximum period of one year of remediation, the juvenile court's jurisdiction continues for a reasonable period afterward for the court to resolve any dispute still existing at the end of that period over whether the minor has attained competency. Even if this was not the case, section 709 permits a court to keep juveniles accused of certain serious offenses (including several with which K.R. was charged) in secure confinement past the one-year remediation period for conclusion of competency proceedings. We also find that section 709 does not preclude the parties from seeking the appointment of their own expert(s) after the initial competency hearing. In the unpublished portion, we hold that K.R. has not demonstrated prejudicial error from his examination by a prosecution expert.

## I. FACTS AND PROCEEDINGS BELOW

On August 27, 2020, the People filed a juvenile delinquency petition under section 602 alleging that K.R. committed murder, in violation of Penal Code section 187, subdivision (a) (count 1); home invasion robbery (*id*., § 211; counts 2 & 3); and residential burglary (*id*., § 459; count 4). K.R. was 17 years old at the time of the alleged offenses.

K.R.'s attorney expressed a doubt about K.R.'s competency, and the court appointed a psychologist to examine K.R. The psychologist found that K.R. had a developmental disability, and that as a result, K.R. was unable to consult with counsel and assist in preparing his defense. Nevertheless, the psychologist

3

believed K.R. could be remediated—that is, restored to competency.

The parties submitted on the expert's report, and on May 13, 2021, the court found K.R. incompetent to stand trial and referred him to remediation services in the hope of restoring him to competency. According to employees at the remediation program, and in part due to Covid-19 pandemic related procedures, K.R. did not begin receiving remediation services until approximately three months later, in August.

Section 709, subdivision (h)(1) calls for an evidentiary hearing "[w]ithin six months of the initial receipt of a recommendation" for remediation to determine "whether the minor is remediated or is able to be remediated." The court timely conducted this hearing in October 2021 and found that K.R. remained incompetent, but that he was likely to be remediated, and ordered him to return to remediation. K.R. thereafter continued to receive remediation services over the next several months. During that time, K.R. was examined by two court-appointed psychologists, both of whom concluded that he was not competent and was not likely to be restored to competency.

With the one-year statutory deadline for remediation looming, the People filed a motion on April 8, 2022, to have K.R. examined by a psychologist retained by the People. K.R.'s attorney objected, arguing that section 709 does not allow the People to retain an expert to evaluate a minor after the initial competency hearing, and that the prosecutor had not complied with the requirements to meet and confer and to inform defense counsel in advance about the name of the expert, and the time, manner, and scope of the evaluation.

4

The juvenile court ultimately overruled the objection, but the litigation on the issue delayed the process. The People's psychologist did not examine K.R. until May 9, 2022, and did not file her report opining that K.R. was competent to stand trial until May 11, 2022. At a hearing on May 12, 2022, K.R.'s attorney argued the juvenile court should dismiss the petition because section 709 permitted only one year of remediation, and that period expired the following day on May 13, 2022. The juvenile court denied the motion without prejudice, and continued the matter to May 18, 2022, to hear from the competing experts.

At the hearing on May 18, 2022, the judge to whom the case was assigned recused himself in the middle of the evidentiary hearing after learning that he was acquainted with one of the percipient witnesses in the case. The matter was then reassigned to another judicial officer, who reconvened the hearing on May 20, 2022. At the May 20, 2022 hearing, K.R.'s attorney renewed the motion to dismiss, and the juvenile court again denied it.

K.R. filed the instant petition for a writ of mandate on July 15, 2022. While the writ petition was pending, the juvenile court found on August 11, 2022, that K.R. was competent to stand trial.[2]

---

[2] We take judicial notice of the juvenile court's ruling.

## II. DISCUSSION

### A. Background on Section 709

Because this case turns almost entirely on the interpretation of section 709, we begin by describing the aspects of that statute relevant to this case.

Proceedings under section 709 are triggered when any party or the court itself expresses a doubt as to the minor's competency. (§ 709, subd. (a)(3).) "If the court finds substantial evidence raises a doubt as to the minor's competency, the [delinquency] proceedings shall be suspended." (*Ibid.*; accord, *id.*, subd. (a)(1).)

At this point, unless the parties stipulate to a finding of incompetency or agree to submit on the issue, "the court shall appoint an expert to evaluate the minor and determine whether the minor suffers from a mental illness, mental disorder, developmental disability, developmental immaturity, or other condition affecting competency and, if so, whether the minor is incompetent." (§ 709, subd. (b)(1).) In addition to the court-appointed expert, "The district attorney or minor's counsel may retain or seek the appointment of additional qualified experts who may testify during the competency hearing. . . ." (*Id.*, subd. (b)(6).) If the People choose to retain or appoint an expert, they must first obtain "an order from the juvenile court after petitioning the court for an order pursuant to the Civil Discovery Act." (*Ibid.*)

Unless the parties stipulate that the minor is incompetent or agree to submit the matter on the basis of the expert's finding that the minor is incompetent, the court must hold an evidentiary hearing at which it is "presumed that the minor is mentally competent, unless it is proven by a preponderance of the evidence

6

that the minor is mentally incompetent." (§ 709, subd. (c).) If the court finds the minor competent, it must reinstate proceedings. (*Id.*, subd. (d).)

Upon a finding of incompetence, "all proceedings shall remain suspended for a period of time that is no longer than reasonably necessary to determine whether there is a substantial probability that the minor will attain competency in the foreseeable future, or the court no longer retains jurisdiction and the case must be dismissed." (§ 709, subd. (e).)

Under subdivision (f) of section 709, if the minor is alleged to have committed only misdemeanor offenses, "the petition shall be dismissed" upon a finding of incompetency. In cases involving incompetent minors accused of at least one felony, "the court shall refer the minor to services designed to help the minor attain competency, unless the court finds that competency cannot be achieved within the foreseeable future." (*Id.*, subd. (g)(1).) The court must order these remediation services to be "provided in the least restrictive environment consistent with public safety," and must consider alternatives to confinement in juvenile hall. (*Ibid.*)

Unless all "parties stipulate to, or agree to the recommendation of, the remediation program," "[w]ithin six months of the initial receipt of a recommendation by the designated person or entity"[3] the court must hold another

---

[3] The statute does not clearly identify who the "designated person or entity" is whose "recommendation" triggers the beginning of the six-month time period for the second evidentiary hearing. The juvenile court inferred that the six-month clock began running upon the receipt of the initial report of the court-

evidentiary hearing to determine "whether the minor is remediated or is able to be remediated." (§ 709, subd. (h)(1).) The statute contemplates three possible outcomes from this hearing. First, "If the court finds that the minor has been remediated, the court shall reinstate the proceedings." (*Id.*, subd. (h)(2).) On the other hand, "If the court finds that the minor will not achieve competency within six months, the court shall dismiss the petition." (*Id.*, subd. (h)(4).)

The third possibility is that "the court finds that the minor has not yet been remediated, but is likely to be remediated within six months." (§ 709, subd. (h)(3).) In this instance, "the court shall order the minor to return to the remediation program. However, the total remediation period shall not exceed one year from the finding of incompetency and secure confinement shall not exceed the limit specified in" subdivision (h)(5)(A). (*Id.*, subd. (h)(3).) Subdivision (h)(5)(A) in turn provides that "[s]ecure confinement shall not extend beyond six months from the finding of incompetence," unless the court considers several factors and determines "that it is in the best interests of the minor and the public's safety for the minor to remain in secure confinement." (*Id.*, subd. (h)(5)(B).) In cases where the minor is alleged to have

appointed expert, who must "make recommendations regarding the type of remediation services that would be effective in assisting the minor in attaining competency." (§ 709, subd. (b)(3).) The Los Angeles Superior Court protocols on juvenile competency hearings interpret the statute the same way. (Greenberg, P. J., Competency to Stand Trial Protocol (Mar. 6, 2019) p. 8 (Protocol) <https://www.lacourt.org/division/juvenile/pdf/CompetencyProtocol.pdf> [as of Mar. 28, 2023].) We take judicial notice of this document.

committed certain serious offenses (which include some of the charges against K.R. in this case),[4] the court may "order secure confinement of a minor for up to an additional year, not to exceed 18 months from the finding of incompetence." (*Id.*, subd. (h)(5)(C).)

Section 709 does not explicitly provide for any additional competency hearings after the six-month hearing described in subdivision (h)(4).[5]  Neither party here disputes the propriety of a hearing after additional remediation is ordered pursuant to section 709, subdivision (h)(3).  In certain cases involving incompetent adult defendants, courts have held that if "the statutes do not authorize . . . a [competency] hearing, the court's convening of one . . . exceed[s] its jurisdiction." (*People v. Quiroz* (2016) 244 Cal.App.4th 1371, 1380; accord, *In re Taitano* (2017) 13 Cal.App.5th 233, 249-256.)  But as our Supreme Court has made clear, these cases are "not applicable where there *is* a statutory basis for holding a competency hearing." (*Jackson v. Superior Court* (2017) 4 Cal.5th 96, 107.)  For example, the statutory scheme for adults does not expressly require a court hearing to determine whether competence has been restored after state health officials file a certificate attesting to such restoration.  (*People v. Carr* (2021) 59 Cal.App.5th 1136, 1144.)

---

[4] These offenses are listed in section 707, subdivision (b) and include, as relevant to this case, the murder and robbery charges against K.R.

[5] The statute does provide that the juvenile court "shall review remediation services at least every 30 calendar days for minors in custody and every 45 calendar days for minors out of custody prior to the expiration of the total remediation period." (§ 709, subd. (g)(1).).

But such hearings are proper and necessary even though they are not expressly mentioned because the statutory structure " 'indicate[s] a legislative intention that such a hearing be afforded.' [Citations.]" (*Ibid.*)

Similarly, section 709 contemplates a further competency hearing such as the one that occurred in this matter, and absurd results would ensue if we rejected the possibility of such a hearing even though it is not expressly mentioned in the statute. As noted above, section 709 specifies that an evidentiary hearing shall take place within the first six months of the initial recommendation from the "designated person or entity" if there is any dispute whether the juvenile has been remediated. (§ 709, subd. (h)(1).) At that hearing the court "shall order the minor to return to the remediation program" if the court finds it likely the minor will be remediated within six additional months (§ 709, subd. (h)(3).) Given this statutory language, as the court in *J.J. v. Superior Court* (2021) 65 Cal.App.5th 222 (*J.J.*) noted, "common sense suggests there must be some sort of hearing approximately 12 months after the initial finding of incompetency, because without a determination of the juvenile's competence at the 12-month mark, there would be little purpose for extending the remediation period to that mark." (*Id.* at p. 232.) Indeed, it is at least arguable that continued confinement for remediation after six months can withstand constitutional scrutiny only if there is a possibility of a further competency hearing. Otherwise, a minor's continued confinement might violate constitutional restrictions on confining an incompetent defendant "more than the reasonable period of time necessary to determine whether there is a substantial probability that he will attain that capacity in the foreseeable

10

future." (*Jackson v. Indiana* (1972) 406 U.S. 715, 738 [92 S.Ct. 1845, 32 L.Ed.2d 435]; accord, *In re Davis* (1973) 8 Cal.3d 798, 801.)

**B.     Section 709 Does Not Require Dismissal if Competency Related Legal Proceedings Are Not Concluded within One Year**

K.R. argues that the one-year remediation limit in section 709, subdivision (h)(3) is absolute, and that "Once 12 months [have passed] and the prosecution has not established that the client has been remediated, the juvenile court loses jurisdiction, and the juvenile petition must be dismissed." Under section 709, subdivision (e), the court may suspend proceedings "for a period of time that is no longer than reasonably necessary to determine whether there is a substantial probability that the minor will attain competency in the foreseeable future, or the court no longer retains jurisdiction and the case must be dismissed." According to K.R., by limiting the remediation period to no more than one year, the Legislature has set a maximum for the period reasonably necessary to determine whether the minor will attain competency, and at that point, the court must dismiss the case.

Issues of statutory construction are questions of law subject to a de novo standard of review. (*California Teachers Assn. v. San Diego Community College Dist.* (1981) 28 Cal.3d 692, 699.) " 'We consider first the words of a statute, as the most reliable indicator of legislative intent.' " (*California Building Industry Assn. v. State Water Resources Control Bd.* (2018) 4 Cal.5th 1032, 1041.) " ' "We interpret relevant terms in light of their ordinary meaning, while also taking account of any related provisions and the overall structure of the statutory scheme to determine what interpretation best advances the Legislature's underlying

11

purpose." ' [Citation.] 'If we find the statutory language ambiguous or subject to more than one interpretation, we may look to extrinsic aids, including legislative history or purpose to inform our views.' [Citation.]" (*In re A.N.* (2020) 9 Cal.5th 343, 351-352.)

Looking first to the words of section 709, subdivision (h)(3) sets a maximum time for remediation, but it neither states nor implies that the court loses jurisdiction at the end of the remediation period. Subdivision (e) indicates that the court must dismiss a case after it loses jurisdiction, but it does not set a condition for the loss of jurisdiction. Two additional provisions of section 709 do require the juvenile court to dismiss a petition in circumstances not applicable here. Under subdivision (f), the court must dismiss the case if a minor who is accused of only misdemeanor offenses is found to be incompetent, and the same is true under subdivision (h)(4) if the court finds at the six-month hearing that the minor is unlikely to be remediated within six more months. If the Legislature had meant to require a dismissal at the end of the remediation period, it presumably would have said so. (E.g., *Delta Stewardship Council Cases* (2020) 48 Cal.App.5th 1014, 1052.)

We also disagree with K.R.'s contention that the court's holding in *J.J.* supports his position. In that case, following an evidentiary hearing, the juvenile court found the remediation services provided over the prior 12-month period had not restored the minor to competency. (*J.J.*, *supra*, 65 Cal.App.5th at pp. 226-227.) The Court of Appeal held that at that point, the juvenile court was required to release the minor from custody and dismiss the petition. (*Id.* at p. 225.) The court reasoned that, "Since a juvenile court must dismiss a juvenile proceeding at the six-

12

month hearing if there is no likelihood the juvenile *will* be remediated by the end of the 12-month remediation period (§ 709, subd. (h)(4)), it makes sense that the court must dismiss the petition at the 12-month hearing where the juvenile *has not*, in fact, been remediated by the end of the 12-month remediation period." (*Id.* at pp. 233-234.) Here, unlike in *J.J.*, the court made no finding that K.R. remained incompetent at the end of one year. Instead, the court was in the process of resolving a dispute between the parties regarding whether K.R. was competent following remediation. Thus, the requirement to dismiss the case under section 709, subdivision (h)(4) was not yet triggered.

K.R.'s interpretation of section 709's maximum 12-month "remediation period" further does not accord with the purpose of that time frame. Although section 709 does not define the "remediation period," the legislative history shows that it is the period during which juveniles are provided services designed to restore them to competency. (E.g., Cal. Bill Analysis, Assem. Conc. in Sen. Amend., Assem. Bill No. 1214 (2017-2018 Reg. Sess.) Aug. 28, 2018, p. 6; Sen. Com. on Public Safety, com. on Assem. Bill No. 1214 (2017-2018 Reg. Sess.) June 26, 2018, pp. 5-6, 9.) K.R.'s interpretation of section 709 thus poses a practical problem: A competency hearing cannot be completed instantaneously upon the completion of remediation services. Adopting K.R.'s position would effectively downsize the statutory remediation period to something meaningfully shorter, particularly when competency is contested. In order to allow enough time to hold a hearing and make a ruling within one year of the initial finding of incompetency, the court would need to schedule the hearing to begin before the deadline, including allotting enough time to conclude the hearing and rule before the

13

one-year mark (and as illustrated here, an additional buffer in case something unexpected arose that delayed the court or counsel timely concluding the hearing). That would mean the last portion of the remediation period would be effectively unavailable, because even if a minor attained competency during that time, it would not be possible to complete a hearing and reinstate proceedings before the deadline. The Legislature may set any maximum remediation period it chooses consistent with constitutional restraints, but to allow for the possibility of restoration of competence up to the end of that period, there must be some allowance for a competency hearing after the remediation period has expired if the entirety of that period is necessary for remediation services.[6]

The author of Assembly Bill No. 1214 stated that the bill was intended to ensure that "vulnerable kids receive appropriate

_____

[6] We note the Courts of Appeal are currently split on a similar issue involving adults, namely whether the maximum commitment period under Penal Code section 1370.1, subdivision (c)(1) for remediation services includes the period up to and including the court making its own determination whether competency has been restored. (Compare *Rodriguez v. Superior Court* (2021) 70 Cal.App.5th 628 [commitment period ends when certificate of restoration filed], review granted Jan. 5, 2022, S272129, with *People v. Carr*, *supra*, 59 Cal.App.5th 1136 [commitment period includes time until trial court makes finding whether a defendant is restored to competency].) As shown by the above, we find the analogous reasoning of *Rodriguez* more persuasive that the juvenile "remediation period," like the adult commitment period, "cover[s] only the time the defendant actually receives treatment to restore his or her competence" and "not to the entire period before the trial court's [finding] . . . of restoration to competence." (*Rodriguez*, *supra*, at p. 654.)

14

services . . . within a reasonable time frame in order to get them out of [juvenile] hall and in proper placement and care going forward." (Sen. Com. on Public Safety, com. on Assem. Bill No. 1214, *supra*, p. 7.) The legislative history further notes that "Research on remediation services suggests a majority of youth can be remediated prior [to] a year if they are able to be remediated" (*id*. at p. 9), so a hearing on whether a juvenile was restored to competency that takes place after the 12-month period should occur infrequently because it will be the rare case where remediation services consume the entire 12-month period. Given the facts before us, we do not believe it violates either the letter or spirit of section 709 to allow for a reasonable period of time after the expiration of the remediation period for the court to conduct a competency hearing. The court may suspend proceedings "no longer than reasonably necessary to determine whether there is a substantial probability that the minor will attain competency in the foreseeable future." (§ 709, subd. (e).) A hearing to determine whether the minor actually has regained competency after receiving remediation services is necessary to determine whether the suspension of proceedings may end.

To the extent a court hearing addressing whether competency has been restored concludes after the applicable statutory period for remediation services, any such delays must account for the requirement that " 'continued commitment [of an incompetent defendant] must be justified by progress toward [the] goal' " of restoring him to competence. (*In re Davis*, *supra*, 8 Cal.3d at p. 804; accord *J.J.*, *supra*, 65 Cal.App.5th at pp. 238-239.) The three-month delay from the end of the remediation period until the court's ruling that K.R. was competent to stand trial was admittedly long, but in the circumstances of this case,

15

the delay was not unreasonable. Nearly the entire 12-month period was used here because of delays from the Covid-19 pandemic, and because litigation over the People's expert delayed that expert examining K.R. and preparing a report. Once the hearing began, the judge presiding over the case recused himself in the midst of the hearing after learning that he was acquainted with a percipient witness in the case, and it required some time before the new judge could conclude the proceedings.

Our holding on this question should not be interpreted as a license to indulge delay and hold minors in secure confinement for any extended period following the conclusion of remediation services. The circumstances in this case represent the exception, not the rule. In most instances, juvenile courts should be able to make a final determination regarding a minor's competency before the one-year remediation period has expired, or very soon thereafter. It is possible that our analysis in this case would be different if the juvenile court had not had a compelling justification for the delay here before the final ruling.

Even if section 709 is read to require the court's adjudication of whether remediation services have restored competency also must conclude during the 12-month maximum for remediation services, dismissal here was not warranted. Section 709, subdivision (h)(5)(C) allows the juvenile court to order minors accused of serious offenses to remain in "secure confinement . . . for up to . . . 18 months from the [initial] finding of incompetence." The People acknowledge that subdivision (h)(5)(C) does not extend the maximum remediation period beyond 12 months, and we agree. Nor does it permit continuing to confine a juvenile after the court has determined remediation services as set forth in section 709 have not or will not restore a

16

juvenile to competency. (See *J.J.*, *supra*, 65 Cal.App.5th at p. 242.) But subdivision (h)(5)(C) did permit the juvenile court to detain K.R. to resolve issues involving his competence past the 12-month remediation period with reasonable promptness.

K.R. argues that section 709, subdivision (h)(5)(A) places a restriction on the application of subdivision (h)(5)(C). Subdivision (h)(5)(A) sets forth several factors[7] the court must

---

[7] K.R also contends that his continued confinement was improper because the juvenile court did not make specific findings on these factors. He has forfeited this argument by failing to object before the juvenile court. At a hearing on October 13, 2021, the court stated as follows: "The court has . . . considered the factors set forth in [section] 709[, subdivision (h)(5)(A)] . . . and finds that upon consideration of these factors . . . it is in the best interest of K.R. and the public safety for him to remain in his current custodial facility." K.R.'s attorney did not ask the court to clarify its ruling or apply each factor listed in subdivision (h)(5)(A) individually. At another hearing on May 12, 2022, the eve of the expiration of the one-year remediation period, the court stated, "This case involves an offense listed in subdivision (b) of [section] 707. . . . [¶] The court finds that it is necessary and in the best interest of K.R. and the public safety to order secure confinement of K.R. . . . until the hearing is concluded over the defense objection." K.R.'s attorney had objected to the extension of K.R.'s confinement beyond one year, but did not argue that the court's ruling was improper for failing to consider all of the factors in section 709, subdivision (h)(5)(A) explicitly. The purpose of the forfeiture rule is "to allow the trial court to correct its errors and 'to prevent gamesmanship by the defense.' " (*People v. Arredondo* (2019) 8 Cal.5th 694, 710.) By waiting until this writ petition to address the issue, K.R. has prevented the court from considering the question or explaining its reasoning in the first instance.

17

consider before ordering the secure confinement of a minor beyond six months, one of which is "[w]here the minor will have the best chance of obtaining competence." (§ 709, subd. (h)(5)(A)(i).) Because K.R. was no longer receiving remediation services beyond the one-year mark, he argues that the possibility of helping him obtain competence could no longer justify his secure confinement.

This argument proves too much. As we noted above, we agree with K.R. that section 709, subdivision (h)(3) establishes a one-year maximum remediation period. But the Legislature, in enacting subdivision (h)(5)(C), plainly intended for juvenile courts, in appropriate cases, "to order secure confinement of a minor for up to . . . 18 months from the finding of incompetence," i.e., after the end of remediation. K.R.'s interpretation would effectively write subdivision (h)(5)(C) out of the statute. We must avoid a statutory " 'construction making some words surplusage' " (*People v. Valencia* (2017) 3 Cal.5th 347, 357), "and every word should be given some significance, leaving no part useless or devoid of meaning." (*City and County of San Francisco v. Farrell* (1982) 32 Cal.3d 47, 54.)

We therefore interpret section 709, subdivision (h)(5)(A)(i) as defining one of several relevant factors the court should consider when deciding whether to order continued secure confinement, not an absolute requirement. When a minor is accused of serious offenses, section 709, subdivision (h)(5)(A)(i) does not bar the court from ordering secure confinement beyond the end of the remediation period under the particular

18

circumstances of this case to conclude a competency hearing following the conclusion of remediation services.[8]

## C. The Juvenile Court Did Not Err by Allowing the People to Retain an Expert to Evaluate K.R.

K.R. argues that the juvenile court erred by allowing an expert appointed by the People to evaluate him in May 2022, almost one year after the court initially found him incompetent. According to K.R., the examination was improper because it came too late, was contrary to the terms of section 709, and because the People failed to comply with the Civil Discovery Act in petitioning the court for the examination. We agree with K.R. that the prosecutor acted improperly in failing to comply with the Civil Discovery Act, but we disagree that this requires ordering the juvenile court to strike the expert's testimony.[9]

---

[8] Our decision on this issue is limited to the circumstances of this case. We need not and do not decide whether section 709, subdivision (h)(5)(C) allows for secure confinement of minors beyond the one-year remediation period in any other situation or for any other reason.

[9] The People argue that we should reject these arguments as untimely. "Appellate courts generally require that nonstatutory writ petitions be filed within 60 days of service of the challenged order, i.e., the same 60-day period applicable to appeals." (*St. Mary v. Superior Court* (2014) 223 Cal.App.4th 762, 771-772, fn. 14.) In this case, the juvenile court issued its order allowing the People's expert to examine K.R. on April 29, 2022. K.R. filed his writ petition 78 days later, on July 15. But we have "discretion to hear a writ petition beyond the 60-day period." (*People v. Superior Court (Lopez)* (2005) 125 Cal.App.4th 1558, 1563.) Because there is no indication that the relatively

1.  *Relevant Proceedings*

On April 8, 2022, after a court-appointed psychologist filed a report concluding that K.R. was incompetent and unlikely to attain competency in the foreseeable future, the People filed a motion to appoint their own expert to evaluate K.R.  The court granted the motion, and on April 20 signed an order to allow the expert, Dr. Kelli Ward, to examine K.R.  On April 22, the court granted a defense motion for its own expert, Dr. David Contreras, to evaluate K.R.  Ward went to juvenile hall on April 26 to examine K.R., but he refused to speak with her on advice of counsel.  K.R.'s attorney objected to the examination on the grounds that he had not received notice of the court's order, and that the prosecutor had not specified the time, place, manner, and scope of the examination, as required by section 709.  At a hearing on April 29, the court found that although the motion did not comply with the terms of the statute, K.R.'s attorney had subsequently been provided with the necessary information.  The court ordered the examination to go ahead.

Ward examined K.R. on May 9, 2022.  She conducted several tests on K.R. that the previous experts had not employed. In addition, Ward did not use the Juvenile Adjudicative Competence Interview (JACI), a test that all of the previous experts had employed.  Ward concluded that K.R. was competent to stand trial, and that he had been malingering, or feigning a developmental disability, in order to avoid going to trial.  In

---

minor delay in the filing of the petition has prejudiced the People, and the writ was timely with regard to the motion to dismiss pursuant to section 709, we will exercise our discretion to address the issues surrounding the expert's evaluation on the merits.

reaching this conclusion, Ward relied on several apparent inconsistencies in K.R.'s behavior, as well as on tests administered by Ward herself and by prior evaluators.

Ward noted that in recorded jailhouse conversations[10] with a fellow inmate, K.R. appeared to understand a great deal about the justice system. He knew that he could be held for no more than 72 hours without being charged with a crime, worried that he might be charged as an adult because he was 18 years old at the time of his arrest, and knew to exercise his *Miranda* rights to avoid giving the police information. He believed he could beat the case because O.J. Simpson had been acquitted even though the police discovered blood on his clothing. He also told the other inmate that he was considered "retarded," and that if he could not beat the charges by other means, he would use the Regional Center—where juveniles are diagnosed with developmental disabilities—as a fallback to fight the case. Ward also reviewed recordings of phone calls between K.R. and his mother,[11] in

---

[10] At oral argument, K.R.'s attorney acknowledged having received the transcripts of the recordings from this *Perkins* operation (see *Illinois v. Perkins* (1990) 496 U.S. 292 [110 S.Ct. 2394, 110 L.Ed.2d 243] (*Perkins*)) in discovery at an earlier stage of the case. The court-appointed experts who examined K.R. initially and after six months of remediation seemingly did not have access to these transcripts, however, as apparently neither the prosecutor nor defense counsel provided them to those experts.

[11] Ward stated that she received recordings of approximately eight phone calls, two of which she included in her report. The two calls described in Ward's testimony and report appear to have been outgoing calls from juvenile hall recorded

21

which K.R. reported what had happened in court that day, suggesting that he understood the proceedings. K.R. knew that he would be sent home if the court ultimately found him incompetent. According to Ward, K.R.'s behavior in these recordings indicated that he was capable of a level of planning and thinking inconsistent with his previous diagnoses.

Ward also pointed to test results that she believed were indicative of malingering. One of the previous evaluators administered a memory test designed to screen for malingering. K.R. took the test three times and scored well within a range indicating malingering. His scores were consistent with those someone could achieve by choosing answers at random. On another occasion, when attempting a test requiring him to put blocks together to form a shape, K.R. appeared to perform the test correctly at first, then took the blocks apart and rearranged them incorrectly. Ward believed K.R.'s inconsistent performance on cognitive tests was also likely due to malingering. In elementary school, K.R. had scored a 92, in the average range, on a cognitive assessment test, but when he was administered an IQ test at age 14 during his first juvenile delinquency proceedings, his score dropped to 52. Ward administered another IQ test during her evaluation, on which K.R. scored a 67. According to Ward, unless K.R. had suffered brain damage or other significant

_____

shortly after court hearings on December 2 and December 16, 2021. Contreras, the defense expert, stated that he listened to recordings of 13 phone calls. It is not clear from the record when the other calls took place, nor when the prosecution obtained the recordings of them. Thus, we cannot determine whether it would have been possible to provide recordings of any calls to either of the previous court-appointed experts.

trauma between tests, variations of that magnitude could only be explained by "motivational issues."

Ward concluded that K.R. was able to understand and assist his attorney in court proceedings, that he did not suffer from a developmental disability, and that he was competent to stand trial.

The defense expert, Contreras, reviewed the same phone recordings and jail transcripts but reached the opposite conclusion. He acknowledged that these transcripts "showed that [K.R.] had awareness of what was potentially going on in his case," but this was not sufficient to establish competency. Contreras noted that in the phone calls, K.R. often seemed not to remember details about what had happened in court that day. In addition, in the recordings K.R. seemed to genuinely want to learn about his case, something Contreras viewed as inconsistent with malingering. To have maintained a charade of ignorance over the entire course of the case "would reflect a level of sophistication that would be vastly inconsistent with past educational records, psychological testing, and previous behavioral observations."

The juvenile court did not agree with all of Ward's conclusions. In particular, the court found that K.R. did suffer from an intellectual disability, "particularly as it applies to his ability to process learning a language." But the court found the jail recordings persuasive, indicating that K.R. understood the way the court system worked and his rights within it. On that basis, the court found that K.R. was competent to assist his counsel and understand the proceedings.

23

2.    *The Examination Was Not Contrary to the Terms of*
      *Section 709*

Two different subdivisions of section 709 provide for
evidentiary hearings.  Subdivision (c) addresses the initial
determination of the minor's competency.  It states that, unless
the parties stipulate that the minor is incompetent, "[t]he
question of the minor's competency shall be determined at an
evidentiary hearing."  Subdivision (h)(1) provides for a second
evidentiary hearing after six months.[12]  A third provision,
subdivision (b)(6), allows "[t]he district attorney or minor's
counsel [to] retain or seek the appointment of additional qualified
experts who may testify during the competency hearing."

K.R. contends that the parties are allowed to appoint their
own experts only at the initial evidentiary hearing.  We disagree.
Nothing in the statute suggests that different evidentiary
hearings should proceed by different rules.  To the contrary,
section 709, subdivision (h)(1) states that "[t]he provisions of
subdivision (c) shall apply at this stage of the proceedings."  K.R.
notes that the provision allowing the parties to appoint their own
experts does not appear in subdivision (c), but rather in
subdivision (b)(6).  Because most of the provisions in subdivision
(b) describe the expert's role at the initial competency hearing,

---

[12] In this case, the evaluation by a prosecution expert took
place in the context of a third competency hearing near the end of
the one-year remediation period.  As we explain above (see
Discussion, part A, *ante*), section 709 implicitly allows for such
hearings to occur.  In the absence of explicit instructions from the
Legislature, we assume the rules applicable to six-month
hearings under subdivision (h)(1) also apply to subsequent
competency hearings.

and because subdivision (h)(1) does not explicitly mention subdivision (b), K.R. argues that the People's right under subdivision (b)(6) to employ an expert to examine a minor does not apply at a subsequent hearing. Although K.R. does not say so, the logic of this argument, if accepted, would also read section 709 to bar a juvenile from retaining his or her own expert after the initial competency hearing.

This argument attempts to parse the text of the statute too finely. Section 709, subdivision (h)(1), in stating that "[t]he provisions of subdivision (c) shall apply," implies that the rules for proceedings under subdivision (c), including those pertaining to the role of experts, also apply. Furthermore, subdivision (b)(6) states that the parties may retain their own experts to "testify during the competency hearing," without specifying the first competency hearing only. The other provisions in subdivision (b) appear primarily aimed at defining the qualifications and conduct of appointed experts at the first competency hearing, but there is no reason they would not also apply to experts who testify at subsequent hearings.

We note the circumstances of this case suggest that the appointment of a party's own expert can sometimes be more useful at a later hearing than at the initial hearing. Issues surrounding a minor's competency that were not initially apparent may surface several months later. In a similar situation in a case involving competency proceedings for an adult defendant, the court in *Baqleh v. Superior Court* (2002) 100 Cal.App.4th 478 rejected applying the text of the statute narrowly to bar an examination by the prosecution's expert. The defendant argued that because the statutes did not explicitly allow for the prosecution's expert to examine the defendant, no

25

examination was permitted.  (*Id.* at p. 489.)  The court disagreed: "Considering that a party that wished to dispute the opinion of a court-appointed expert would be unable to do so effectively without the use of its own expert, the absence of an express statutory restriction on the use of such experts renders it highly implausible that the Legislature intended any such restriction." (*Id.* at p. 490.)  The same logic counsels in favor of allowing the parties to retain their own experts to examine the minor and testify at all evidentiary hearings in competency proceedings for minors.

> 3. *The People Were Not Dilatory in Seeking to Appoint their Own Expert*

K.R. contends that the trial court erred by allowing the remediation period to be extended as a result of the People's expert's examination of K.R.  We disagree.  As we explained above (see Discussion, part B, *ante*), the court is not required to dismiss a case immediately when the remediation period expires without a finding that the minor has attained competency.  In this case, there is no indication that the prosecution waited an unnecessarily long time before seeking to retain an expert to examine K.R., nor that the expert's evaluation unduly delayed the case.

K.R. proposes no standard for judging whether a request to appoint an expert has come too late.  In the absence of any statutory limitation on the time to appoint an expert, we must defer to the discretion of the juvenile court in setting a limit, and in this case we perceive no abuse of that discretion.  The People first sought to retain their expert on April 8, 2022, the day after the court's appointed expert, Dr. Oona Appel, testified that, in her opinion, K.R. was incompetent and unlikely to attain

competency within the foreseeable future.  The prosecution might have anticipated the need to retain its own expert sooner—Appel filed her report with the court in late February, with an update on March 8—but the prosecutor may have recognized that she needed to retain her own expert only after examining Appel at the hearing on April 7.  Nearly a month of litigation ensued over the question of whether Ward, the People's expert, should be allowed to examine K.R., but even so, Ward managed to conduct her examination and file her report within a few days, just before the May 13 end of the remediation period.  The court most likely would have issued its final ruling on K.R.'s competency sooner, except that the judge assigned to the case recused himself from the case during Ward's testimony on May 18 after realizing that he was acquainted with one of the percipient witnesses.

To be sure, the prosecutor might have been able to reduce some of the delays in the case by requesting to appoint a prosecution expert sooner, or by providing the transcripts of the *Perkins* operation to Appel.  But this does not mean the juvenile court abused its discretion by allowing the appointment of a prosecution expert in April 2022.

4. *The People's Failure to Comply with the Civil Discovery Act when Appointing its Expert Did Not Prejudice K.R.*

When the People intend to appoint an expert to examine a minor, they must first "petition[ ] the court for an order pursuant to the Civil Discovery Act (Title 4 (commencing with Section 2016.010) of Part 4 of the Code of Civil Procedure)."  (§ 709, subd. (b)(6); see also *Baqleh v. Superior Court*, *supra*, 100 Cal.App.4th at p. 491 [holding that the Civil Discovery Act applies to examinations in adult competency hearings].)  The relevant

27

section of the Civil Discovery Act for this purpose is Code of Civil Procedure section 2032.310, which provides that when a party seeks to conduct a mental examination, it must file a motion "specify[ing] the time, place, manner, conditions, scope, and nature of the examination, as well as the identity and the specialty, if any, of the person or persons who will perform the examination. The motion shall be accompanied by a meet and confer declaration under [s]ection 2016.040." (Code Civ. Proc., § 2032.310, subd. (b).)

We agree with K.R. that the People in this case failed to comply with the statute. On April 8, 2022, the People filed their motion seeking to retain an expert to evaluate K.R., but did not include a meet and confer declaration or any of the information regarding the examination specified in Code of Civil Procedure section 2032.310. On April 20, the court signed an order instructing the probation department and K.R. to allow the expert to examine K.R., but K.R.'s attorney told the court that he was not aware of the order until Ward went to the juvenile hall to conduct the examination, and K.R. called him. K.R.'s attorney instructed K.R. not to participate in the examination, and the court held a hearing to resolve the matter. At the hearing, the court granted the motion to allow the People's expert to examine K.R., even though the prosecutor never filed a motion that complied with the Civil Discovery Act.

If the juvenile court erred by granting the motion in these circumstances, however, the error was harmless.[13] Although the

---

[13] Because K.R.'s claim is based solely on the application of state statutes, we review for harmless error under the *Watson* standard. (*People v. Epps* (2001) 25 Cal.4th 19, 29.) That is, he

28

People's motion was defective, K.R.'s attorney was able to learn the relevant information and challenge the scope of the evaluation before it occurred. The prosecutor gave K.R.'s attorney a copy of Ward's curriculum vitae before the hearing, and K.R.'s attorney spoke with Ward about the tests she planned to conduct. Afterward, he acknowledged that Ward "does seem qualified pursuant to the statute," and that "she's perfectly acceptable as an evaluator in this kind of case." K.R. argues that the prosecutor's disclosure was insufficient because Ward told his attorney about "certain tests that she would possibly administer," but did not say exactly which tests she would use "because it depended . . . on how the evaluation was going." Ward's answer seems reasonable in light of the complexities of a psychological exam, and we have no reason to believe she would have been able to produce a more complete answer if the People's motion had complied with the Civil Discovery Act.[14]

---

must show that "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*People v. Watson* (1956) 46 Cal.2d 818, 836.)

[14] The court's effort to ameliorate the inadequacies of the prosecutor's motion distinguishes this case from *Baqleh v. Superior Court*, *supra*, 100 Cal.App.4th 478. In *Baqleh*, as here, the prosecution failed to comply with the Civil Discovery Act in seeking to employ an expert to evaluate an incompetent defendant. The court granted the defendant's writ petition and blocked the evaluation because, "Among other things, the order permits unspecified individuals to examine petitioner at times and places of their choosing with respect to matters that may be unrelated to his competence to stand trial." (*Baqleh*, *supra*, at p. 492.)

K.R. argues that if the motion had complied with the Civil Discovery Act, it would have revealed that Ward did not intend to use the JACI during the examination. The superior court's protocols for juvenile competency proceedings state that when a panel expert examines a juvenile, the JACI "shall be used unless its use is contraindicated." (Protocol, *supra*, at p. 4.) We disagree that Ward's failure to use the JACI was a valid basis for challenging her examination of K.R. The court protocols "may serve as useful guidance concerning the placement, detention, and treatment of minors found incompetent in delinquency proceedings. But [they do] not independently give rise to any claim for relief because [they do] not by [themselves] have any binding force of law. (*In re Albert C.* (2017) 3 Cal.5th 483, 492.) Second, by their own terms, the protocols require use of the JACI in examinations by panel experts, and they do not purport to apply to experts retained by one of the parties. There is no reason to believe the court would have required Ward to use the JACI in her examination if the issue had been presented.

K.R. also objects to Ward's employment of "interrogation" of K.R. in her evaluation. In making this argument, K.R. refers to a section of Ward's testimony in which she stated, "one of the things that I always ask people that I'm evaluating for competency is, 'what do you say happened?'" Ward recounted that when K.R. responded to this question, "he said he didn't do it. He didn't kill anybody, which is an alternative explanation for his behavior. And he also says he had no memory of anything that happened that day." There is no indication that Ward asked K.R. anything more about his participation in the alleged offenses, and we are aware of nothing else in the record that would constitute an interrogation. K.R. cites no authority to

support his claim that Ward's question was improper.  To the contrary, the Supreme Court has recognized that "determining a defendant's mental competency requires an assessment of the defendant's ability to understand the nature of the proceedings and to assist counsel in conducting a defense.  ([Pen. Code,] § 1367, subd. (a).)  To make this assessment, the mental health expert will want to evaluate the defendant's ability to discuss the facts of the case, even though the defendant's guilt of the offense charged is not relevant to the inquiry." (*People v. Pokovich* (2006) 39 Cal.4th 1240, 1251.)  Questions from a prosecution expert about the crime in the course of a mandatory evaluation do not violate the defendant's privilege against self-incrimination so long as "the defendant's statements during the examination are inadmissible for any purpose at trial." (*Id.* at p. 1252.)  We see no reason a different rule would apply in juvenile delinquency proceedings.

At the end of the hearing where the court ordered Ward's examination to proceed, the court stated that, "The time, place, manner, conditions, and scope of the examination have now been discussed with the parties on the record, as have the expert's qualifications and proposed scope of examination.  This reality provides the court with some assurances that K.R.'s statutory rights under the civil discovery statute have been duly considered."  The court's assessment seems generally accurate, even if the prosecutor did not fulfill the requirements of section 709, subdivision (b)(6) in filing her motion.

When Ward testified, K.R.'s attorney cross-examined her extensively.  In addition, K.R.'s own expert, Contreras, responded to Ward's report and explained why he believed Ward was wrong.  These responses were apparently effective.  In explaining its

31

ruling that K.R. was competent to stand trial, the court stated that it disagreed with Ward's conclusion that K.R. did not have an intellectual disability. The court did not rely on Ward's evaluations and test results. Instead, what "tip[ped] the scale for the court" was listening the recordings of K.R. speaking with fellow inmates and with his mother, in conversations indicating that he understood the court proceedings and "that he could use his eligibility as a regional center consumer to get the case dismissed." The record does not show that if the People's motion had complied with the Civil Discovery Act, or even if Ward had not examined K.R. at all, there is a reasonable probability that he would have attained a better outcome.

## DISPOSITION

The petition for writ of mandate is denied.

CERTIFIED FOR PARTIAL PUBLICATION

WEINGART, J.

We concur:

CHANEY, J.

BENDIX, Acting P. J.

32